**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

ASHFIELD HEALTH LLC,
  *Plaintiff,*

  v.                                          No. 3:21-cv-00417 (VAB)

MATTHEW JACOBSON, *et al.*,
  *Defendant.*

---

## RULING AND ORDER ON MOTION FOR TEMPORARY RESTRAINTING ORDER AND PRELIMINARY INJUNCTION

Ashfield Health LLC ("Ashfield," the "company," or "Plaintiff") has sued Matthew Jacobson ("Defendant"), a former executive of the company. Ashfield seeks a temporary restraining order and preliminary injunction to enforce clauses in Mr. Jacobson's employment contract pertaining to his ability to work for a competitor and his ability to use and distribute Ashfield's alleged trade secrets. Pl.'s Emergency Mot. for Order to Show Cause Seeking Temp. Restraints & Prelim. Inj., ECF No. 3 (Mar. 25, 2021) ("Pl.'s Mot.").

For the reasons stated below, Ashfield's motion for temporary restraining order and preliminary injunction is **DENIED in part** and **GRANTED in part**. Mr. Jacobson shall be permitted to work for Ashfield's competitor, but must return to Ashfield all information, if any, still in his possession and belonging to Ashfield.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

On May 17, 2021 and June 2, 2021, the Court heard evidence relating to Ashfield's motion for temporary restraining order and preliminary injunction. Min. Entry, ECF No. 61 (May 17, 2021) ("May 2021 Hearing"); Min. Entry, ECF No. 71 (June 2, 2021) ("June 2021

Hearing"). During the two-day hearing, sixty-nine exhibits were entered into evidence and three witnesses testified: (1) Cary Wilson, Senior Digital Forensics Project Manager for N1 Discovery, a company specializing in digital forensics, cyber discovery and eDiscovery; (2) Amar Urhekar, Global President of Ashfield Health LLC; and (3) Matthew Jacobson, Defendant and former employee of Ashfield.

From the information gathered through the two-day hearing and the parties' written submissions, the Court finds the following:

### i.  Ashfield Health LLC

"Ashfield is a medical communications company and [has] serve[d] pharmaceutical and biotech companies . . . for more than twenty years." Compl., ECF No. 1, at ¶ 7 (Mar. 25, 2021). "Ashfield offer[s] a comprehensive and integrated branding and marketing system for [its] clients," *id.* ¶ 8, and it often provides "commercially sensitive" services like "branding programs for pre-released pharmaceuticals, market reports comparing competitors, [] internal training," *id.* ¶ 14, "historical product sales information, . . . and financial targeting and tracking data," *id.* ¶ 15.

"Ashfield maintains various trade secrets[,] . . . [which] include proprietary or business-sensitive information not generally known to the public that, if released to unauthorized persons, would be determinantal to its business and reputation." *Id.* ¶ 18. Ashfield defines its trade secrets as

> customer pitch decks, its confidential pricing and margin information, its financial and sales data, training manuals developed[,] . . . its national and global customer list including non-public information that could only be learned through cultivation of the business relationship between each customer and Ashfield employees, the identities and rankings of companies targeted for acquisition, and other information which derives independent economic value for Ashfield by virtue of its confidential status.

*Id.* To preserve confidentiality, "Ashfield stores its [t]rade [s]ecrets behind password protection and two-step authentication, and restricts access . . . to only those employees who require access to fulfill their job duties." *Id.* ¶ 19. "[P]hysical access to [Ashfield's] locations" is also "limit[ed]." *Id.*

### ii. Matthew Jacobson

Matthew Jacobson is a resident of Connecticut and former "President of Ashfield." *Id.* ¶ 2. Mr. Jacobson "started [working] as a medical writer," Tr. of Mot. Hr'g, ECF No. 73, at 335:11-12 (June 5, 2021) ("2d Tr."), after he graduated college in 1998, *see id.* at 335:16-17. Mr. Jacobson has "worked in medical communications [his] entire career," advancing "from medical writer to managing medical writers to running a medical team to ultimately running medical communications agencies." *Id.* at 335:10-15.

During or around 2008, Mr. Jacobson began working as "managing director" for InforMed Direct, Inc. ("InforMed"), a company that was "part of the InforMed Group." *Id.* at 336:8-13. Mr. Jacobson was a "minority shareholder," with "ownership of less than 5 percent of the total group." *Id.* at 336:22-24.

On or around August 2010, InforMed Group was acquired by another company. *Id.* at 336:14-19. Mr. Jacobson sold his shares and "received about $1.8 million, which was consistent and proportionate to [his] share ownership." *Id.* at 337:19-21. It was at this time, in August 2010, that "InforMed employed [Mr. Jacobson] according to the terms of [the] Employment Agreement" at issue in this case. Compl. ¶ 26; *see also* Employment Agreement, Ex. B to Def.'s Mem. of L. in Opp'n to Pl.'s Mot. for Order to Show Cause, ECF No. 44-3 (Apr. 23, 2021) ("Agreement"). Under the terms of the Agreement, Mr. Jacobson was able to "stay in the role of managing director," 2d Tr. at 338:2, and served as InforMed's "President and Managing

Director, [the] highest officer overseeing all operations in the United States of America," Compl. ¶ 28.

On or around 2019, "InforMed Direct and a number of other acquired entities were merged together to form Ashfield Health, LLC." 2d Tr. at 338:13-14. Mr. Jacobson "continued to work for InforMed and Ashfield." *Id.* at 338:16-18.

In or around "October 2020, Mr. Jacobson's title was changed from Executive Director to President, North America, but his duties and responsibilities remained the same." Def.'s Mem. of L. in Opp'n to Pl.'s Mot. for Order to Show Cause, ECF No. 46, at 4-5 (Apr. 23, 2021) ("Def.'s Mem."). "[S]pecifically[, he] was responsible for the executive oversight of [Ashfield's] acquired businesses in the United States." 2d Tr. at 339:12-14. The "global leadership team" included seven members and constituted the "senior most governing body of Ashfield Health." Tr. of Mot. Hr'g, ECF No. 63, at 150:10-19 (May 25, 2021) ("1st Tr.").

### iii.    Mr. Jacobson's Resignation from Ashfield

In February 2021, Mr. Jacobson resigned from Ashfield to work for a competitor, Helios Medical Communications Ltd. ("Helios"). Compl. ¶¶ 52-53. "Helios is in the medical communications industry" and "competes against Ashfield for the same customers. *Id.* ¶¶ 43-44. "Helios'[s] three founders all separated from Ashfield's UK affiliate . . . and founded Helios together. *Id.* ¶ 46. "Helios does not [] have a location within the United States[,] but is in the process of opening a physical location in the United States." *Id.* ¶ 47.

Mr. Jacobson began communicating with Helios "[i]n January of 2020 [when] [he] sent a casual e[-]mail to longstanding former colleague and friend" who also so happened to be "a director of Helios." 2d Tr. at 363:5-8. In the e-mail, Mr. Jacobson said he was "contemplating

whether to do something differently," and asked that they "please keep [him] in mind" if Helios was "interested in expanding into the U.S." *Id.* at 363:8-12; Joint Ex. 4.

Over the next several months, Mr. Jacobson continued communications with Helios's executives, and after "15 to 20 . . . online conferences" with Helios, 1st Tr. at 312:25-313:3, Mr. Jacobson "signed [a] non-disclosure [agreement]" in "late July" 2020, *id.* at 312:21-24. By August 2020, Mr. Jacobson and Helios's executives were creating concrete plans for "Project Apollo," Joint Ex. 6, which involved the incorporation of "Apollo Medical Communications" as a "U.S. venture . . . separate from the Helios name." 2d Tr. at 346:3-6. In addition to creating "action plans" for the development of Apollo, *see* Joint Ex. 16, Mr. Jacobson also "prepared a PowerPoint presentation to present to . . . NorthEdge [Capital]," 1st Tr. at 299:18-19; *see* 2d Tr. at 366:2-4, "a private equity firm that invests in boutique businesses . . . [and] partner[s] with [] management teams to help them grow their businesses," 1st Tr. at 177:11-17. On January 14, 2021, "NorthEdge [publicly] announced . . . its investment in Helios" *Id.* at 316:3-8. On January 29, 2021, Mr. Jacobson signed "the material terms between [himself] and Helios." *Id.* at 316:20-24.

On February 1, 2021, Mr. Jacobson resigned from Ashfield, by first "hav[ing] a conversation with [his] boss, Mr. Urhekar," and then "with an e-mail providing written notice." 2d Tr. at 357:9-11. Mr. Jacobson told Mr. Urhekar "he had been approached by Helios to set up the North America operations . . . [and Mr. Urhekar and Mr. Jacobson] had a long conversation about . . . why [Mr. Jacobson] felt this was the right thing for him to do at this stage of his career, predominately because Helios is in medical communications" and also "from a financial perspective it was an irresistible offer." 1st Tr. at 175:7-25.

"On February 15, 2021, Ashfield's internal IT department accessed download logs from Ashfield's private, secure servers and created a box report showing [Mr. Jacobson's] download activity from Ashfield's secure server to [his] work computer." Compl. ¶ 58. The report showed Mr. Jacobson "downloaded irregular and substantial volumes of Ashfield['s] information," *id.*, "in the days leading up to and even after his resignation," *id.* ¶ 57. It was determined that Mr. Jacobson downloaded between 1,200 and 1,900 files from Ashfield's servers. *See* 1st Tr. 308:24-309:6.

"[T]he first time . . . Ashfield raised any concerns or comments about the restrictive covenant provisions in [Mr. Jacobson's] employment agreement . . . w[as] on February 16, 2021 . . . [at] a transition meeting with Mr. Urhekar, . . . the head of HR[,] and some[one] from [Ashfield's] internal legal counsel." *Id.* at 361:25-362:8. On the same day, Mr. Jacobson's "access to the Ashfield systems was terminated." *Id.* at 362:18-19. Due to "contractual obligations," Mr. Jacobson "remain[ed] employed by Ashfield until April 2, 2021." Compl. ¶ 56.

"In his final year of employment, Ashfield paid [Mr.] Jacobson a $367,709 salary and approximately $239,248.48 in an additional bonus and stock option buyouts." Ashfield Health LLC's Closing Arg. for the Evidentiary Hr'g on its Mot. for Prelim. Inj. & TRO, ECF No. 81 (June 11, 2021) ("Pl.'s Closing").

## B. Procedural History

On March 25, 2021, Ashfield filed its Complaint seeking to enjoin Mr. Jacobson from working for Helios and the return of any of Ashfield's proprietary information. Compl.

On the same day, Ashfield filed a motion for temporary restraining order and preliminary injunction. Pl.'s Mot.

On March 30, 2021, a telephonic status conference was held. Min. Entry, ECF No. 19 (Mar. 30, 2021).

On April 21, 2021, Ashfield filed a joint motion for a discovery conference. Joint Mot. for Disc. Conf., ECF No. 28 (Apr. 21, 2021).

On April 22, 2021, the Court granted the motion for a discovery conference. Order, ECF No. 32 (Apr. 22, 2021).

On April 22, 2021, Ashfield filed a motion to compel discovery from Apollo Medical Communications, Inc. Pl. Ashfield Health LLC's Mot. Compelling Disc. from Non-party Apollo Med. Commc'ns., Inc., ECF No. 36 (Apr. 22, 2021); Pl. Ashfield Health LLC's Mem. in Supp. of Compelling Disc. from Non-party Apollo Med. Commc'ns., Inc., ECF No. 37 (Apr. 22, 2021); Decl. of Rebecca A. Brazzano, Esq. in Supp. of Pl. Ashfield Health LLC's Mem. in Supp. of Compelling Disc. from Non-Party Apollo Med. Commc'ns, Inc., ECF No. 38 (Apr. 22, 2021).

On the same day, Apollo filed its response to Ashfield's motion to compel. Br. of Non-party Apollo Med. Commc'ns., Inc., in Supp. of Its Obj. to Pl.'s Subpoena, ECF No. 39 (Apr. 22, 2021).

On April 23, 2021, the Court held a discovery conference. Min. Entry, ECF No. 42 (Apr. 23, 2021).

On the same day, the Court denied the motion to compel without prejudice to renewal following the forthcoming evidentiary hearing. Order, ECF No. 43 (Apr. 23, 2021).

Also, on that day, Mr. Jacobson filed his opposition to Ashfield's motion for temporary restraining order and preliminary injunction, Def.'s Mem. of L. in Opp'n to Pl.'s Mot. for Order to Show Cause, ECF No. 44 (Apr. 23, 2021), along with a motion to seal the brief, Def.'s Mot. to Seal, ECF No. 45 (Apr. 23, 2021), and an unredacted version of the opposition, Def.'s Mem.

On April 25, 2021, the Court granted Mr. Jacobson's motion to seal. Order, ECF No. 47 (Apr. 25, 2021).

On May 12, 2021, Ashfield replied to Mr. Jacobson's response to the motion for temporary restraining order and preliminary injunction. Pl. Ashfield Health LLC's Reply Mem. in Further Supp. of Mot. for TRO & Prelim. Inj., ECF No. 52 (May 12, 2021); Pl. Ashfield Health LLC's Reply Mem. in Further Supp. of Mot. for TRO & Prelim. Inj., ECF No. 54 (May 12, 2021).

On May 13, 2021, the Court granted the Ashfield's motion to seal its memorandum in further support for temporary restraining order. Order, ECF No. 56 (May 13, 2021). The Court also issued an order giving the parties until 5:00 p.m. on May 14, 2021 to file their witness and exhibit lists, in preparation for the evidentiary hearing scheduled for May 17, 2021. Order, ECF No. 55 (May 13, 2021).

On May 17, 2021, the Court held an evidentiary hearing regarding the pending motion for temporary restraining order and preliminary injunction. May 2021 Hearing.

On June 2, 2021, the Court recommenced the evidentiary hearing regarding the pending motion for temporary restraining order and preliminary injunction. June 2021 Hearing.

On June 11, 2021, Ashfield filed its written closing arguments for the evidentiary hearing. Pl.'s Closing.

On the same day, Mr. Jacobson filed his written closing arguments for the evidentiary hearing. Def. Matthew Jacobson's Post-Hr'g Br. in Opp'n to Pl.'s Mot. for Order to Show Cause, ECF No. 83 (June 11, 2021) ("Def.'s Closing").

## II.    STANDARD OF REVIEW

"A temporary restraining order is a short-term protective device authorized under Rule 65 of the Federal Rules of Civil Procedure. Its purpose is to protect a party from irreparable harm until more lasting relief . . . can be sought." *HarperCollins Publishers L.L.C. v. Gawker Media LLC*, 721 F. Supp. 2d 303, 305 (S.D.N.Y. 2010) (citing *American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977)).

> The court may grant a motion for temporary restraining order if the moving party demonstrates a risk of irreparable harm and either a) a likelihood of success on the merits or b) the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships decidedly favoring the party requesting the relief.

*Ward v. Thomas*, 895 F. Supp. 401, 403 (D. Conn. 1995) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam)).

Courts in this Circuit apply the same standard to motions for temporary restraining order and preliminary injunctions. *See Local 1814, Int'l Longshoremen's Ass'n AFL-CIO v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). Interim injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). To prevail, the plaintiff must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (internal quotation mark omitted).

"[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, *i.e.*, the situation that existed between the parties immediately prior to the events that precipitated the dispute." *Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238,

243 (W.D.N.Y. 2010); *see also Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp.

378, 381 (D. Conn. 1992) ("It is well established in this Circuit that the purpose of a preliminary

injunction is to preserve the *status quo* between two parties."). "Because mandatory injunctions

disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a

clear or substantial likelihood of success on the merits.'" *North American Soccer League, LLC v.*

*U. S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quoting *New York Civil Liberties Union*

*v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). "A mandatory preliminary injunction

'should issue only upon a clear showing that the moving party is entitled to the relief requested,

or where extreme or very serious damage will result from the denial of preliminary relief.'"

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (quoting *Citigroup Global Mkts.,*

*Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)).

"The district court has wide discretion in determining whether to grant a preliminary

injunction." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 511 (2d Cir. 2005). The

Supreme Court, however, has found that "a preliminary injunction based only on a possibility of

irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary

remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such

relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## III. DISCUSSION

Ashfield has sued Mr. Jacobson to prevent him from working for a competitor and to

prevent him from using any trade secrets he may have acquired. To determine if such relief is

possible and warranted, the Court must determine if there is sufficient evidence to prove that Mr.

Jacobson violated a legal obligation, and, if so, if the requisite standard for the relief requested has been met.

The Court addresses each of these issues in turn.

## A. Enforcement of a Restrictive Covenant

The relevant standard for a preliminary injunction is: (1) whether Ashfield has an established right that can be enforced by preliminary injunction; (2) whether it is likely that Ashfield can succeed on the merits; (3) whether Ashfield would suffer an irreparable harm in the absence of a preliminary injunction; and (4) whether balance of the equities weigh in favor of Ashfield. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). The first two inquiries rely on the validity of the restrictive covenant included in the employment agreement established between Mr. Jacobson and Ashfield.

When evaluating the reasonableness of covenants not to compete, Connecticut courts look to five factors: "(1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." *Robert S. Weiss & Assocs., Inc. v. Wiederlight,* 208 Conn. 525, 529 n.2 (1988). "These criteria 'are disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable.'" *A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 293 (D. Conn. 2015) (quoting *New Haven Tobacco Co., Inc. v. Perrelli,* 18 Conn. App. 531, 534 (1989)).

"[U]nder Connecticut law, 'time and geographical restrictions are to be reviewed as intertwined considerations', meaning, for instance, that '[a] restriction covering a large area might be reasonable if in effect for a brief time, while a restriction covering a small area might

be reasonable for a longer time.'" *Id.* (quoting *Van Dyck Printing Co. v. DiNicola,* 43 Conn.

Supp. 191, 197 (1993)). "Connecticut courts have upheld restrictive covenants, both antisales

and anticompetitive, lasting two years or more on multiple occasions." *Id.* at 294 (citing

*Wiederlight,* 208 Conn. at 531 (two years without geographic limitation)); *Scott v. Gen. Iron &*

*Welding Co.,* 171 Conn. 132, 136-37 (1976) (five years with geographic limitation); *Torrington*

*Creamery v. Davenport,* 126 Conn. 515, 520 (1940) (two years with geographic limitation).

The Employment Agreement, signed by Mr. Jacobson in August 2010, contains the

following provisions:

> 10. <u>Noncompetition</u>.  During the one-year period ending on the first anniversary of the date of the termination of Jacobson's employment, for any reason other than pursuant to Sections 5(d) and 5(e), of his employment with Employer (whether that date of termination is before, on, or after the first anniversary of the Closing Date), Jacobson will not, directly or indirectly (on his own behalf or as an [*sic*] partner, shareholder, or other owner or as an agent, employee, officer, director, or consultant):
>
> a) lend money or credit to, invest in, own any interest in, engage in, or otherwise participate in, any Person that competes with the Employer Business anywhere within the United States of America or anywhere else in the world Employer is conducting the Employer Business at the time of termination of Jacobson's employment (without regard to where the Person that so competes may base its operations); . . . .

Agreement at 6. Mr. Jacobson now alleges that the terms of the Agreement are unreasonable and

unenforceable. *See* Def's Closing at 11-13. According to Mr. Jacobson, the geographic scope of

the non-compete clause is too broad, because it "seeks to preclude [him] from working in any

capacity, anywhere in the wor[l]d, in a market for which Ashfield has only a 3% share." *Id.* at 6.

Mr. Jacobson argues that "Ashfield has a minimal global share of this multi-billion dollar

market. Thus, precluding [him] from working in medical communications, in any capacity,

anywhere in the world is [] unreasonable." *Id.* at 12.

Mr. Jacobson also argues that the non-compete clause is more restrictive of his employment prospects than it is protective of Ashfield's actual interests. *See id.* According to Mr. Jacobson, "[Ashfield's] motion for injunctive relief is based on concerns of disclosure of sensitive information and solicitation of business, none of which have occurred or will occur." *Id.* Mr. Jacobson argues that "[n]othing Ashfield presented at th[e] hearing or in its brief[s] shows otherwise." *Id.*

Mr. Jacobson alleges that the Agreement also is unenforceable because he "will be unable to pursue his occupation and help provide for his family if the non-compete is enforced." *Id.* at 13. He argues that such a restriction interferes with the public's interest, because "[k]eeping [him] out of work will prevent him from using his years of expertise to facilitate the flow of important medical and scientific information crucial to improving patient care," which Mr. Jacobson argues, is "contrary to the public's interest." *Id.*

Ashfield argues that the Agreement is reasonable and should be upheld, in part, because "[Mr.] Jacobson signed the Employment Agreement twice, once as employer and once as employee." Pl.'s Closing at 4. Ashfield argues that Mr. Jacobson "intends to compete and has already taken affirmative steps to compete, and forensic evidence confirmed that [he] downloaded thousands of Ashfield's documents, including Ashfield's [t]rade [s]ecrets." *Id.* at 8.

Ashfield also argues that it "is not seeking an injunction prohibiting [Mr.] Jacobson from all employment." *Id.* at 15. According to Ashfield, "[t]he proposed injunction – and the Employment Agreement – prohibits competitive employment, a term [Mr.] Jacobson specifically agreed to." *Id.* Ashfield argues that "[Mr.] Jacobson's global competitive desire, and Ashfield's global clientele, permit a global restriction as applied to its competitors as well as Ashfield's

global customers because [Mr.] Jacobson knows the majority of Ashfield's bigger customers." *Id.* at 10 (internal quotation marks and alterations omitted).

The Court agrees, in part.

Under the terms of the Agreement, Mr. Jacobson is barred from employment with Ashfield's competitors for a period of one year. *See* Agreement at 6. One-year employment restrictions are reasonable under Connecticut law, which allows non-competition agreements, so long as they are reasonable in scope and geography. *See Tyco Healthcare Grp. LP v. Ross*, No. 3:11-CV-373 (CFD), 2011 WL 1790186, at *3 (D. Conn. May 10, 2011) ("The non-compete agreement . . . meets these criteria for reasonableness. First, the restriction operated for two years. Courts applying Connecticut law have upheld two-year non-compete restrictions as reasonable."); *see also Minnesota Mining and Mfg. Co. v. Francavilla*, 191 F.Supp.2d 270, 280 (D. Conn. 2002) (holding two-year restriction was "both reasonable and necessary" to protect confidential and proprietary information). Thus, with respect to the length of the restrictive covenant, a year-long ban from working for a competitor is not *per se* unreasonable.

The Agreement also bars Mr. Jacobson from working for any company in competition with Ashfield, worldwide. *See* Agreement at 6. Connecticut courts, however, have been amendable to restive covenants with a global reach, so long as they are reasonably connected to the employer's business. *See Tymetrix, Inc. v. Szymonik*, No. CV 064019412S, 2006 WL 3908558, at *5-*6 (Conn. Super. Ct. Dec. 28, 2006) (upholding two-year national and international noncompetition provision extending anywhere the employer had sold its product); *Entegee, Inc. v. Korwek*, No. 3:15-CV-1087 (VLB), 2015 WL 5202902, at *4 (D. Conn. Sept. 4, 2015) (collecting cases); *Minnesota Mining*, 191 F.Supp.2d at 274, 280-81 (upholding an agreement that protected the company "in the United States or in any country in which [it] has a

plant for manufacturing a product upon which [the employee] worked"); *Wiederlight*, 208 Conn. at 531 (upholding an agreement that only protected the employer where it did business).

In *Tyco Healthcare v. Ross*, the district court found that even though the "non-compete agreement encompasse[d] 'any geographic area with[in] which any job responsibilities for the Company were concerned," "the geographic restriction in the agreement [wa]s reasonable," because the plaintiff was "a worldwide manufacturer and distributor of surgical devices." 2011 WL 1790186, at *3. In addition to approving of the temporal restraint of two years and the global geographic restraint of the restrictive covenant, the court in *Tyco* found the contract to be both reasonable and viable because "it only prevent[d] [the defendant] from working on products related to [the plaintiff's]"; it "d[id] not unduly restrict [the defendant's] opportunity to work as an engineer," because the plaintiff was "still willing to employ [the defendant], or pay him his former salary"; and, "the agreement d[id] not interfere with [] public interest, b[ecause] [it] [wa]s narrow enough to further [the plaintiff]'s legitimate business interest." *Id.*

In *Tyco*, however, even though the restrictive covenant was found to be valid, reasonable, and enforceable, the court ultimately denied the plaintiff's motion for a preliminary injunction. *Id.* It found that the plaintiff "failed to satisfy its burden of showing that it [wa]s likely to succeed on the merits," *id.* at *5, because, in spite of having "identical job titles" and the fact that the companies at issue were competitors, the defendant's day-to-day activities would change, *id.* at *4, and the court found "the balance of hardships tip[ped] in favor of [the defendant]" who "would lose his job" if a preliminary injunction was granted, *id.* at *5.

Here, as in *Tyco*, the temporal and geographic scope of the Agreement between Ashfield and Mr. Jacobson is both reasonable and valid, but will have an undue effect on Mr. Jacobson's ability to pursue his livelihood. *See Prezio Health Inc. v. Schenk*, No. 3:13-CV-01463 (WWE),

2016 WL 1367726, at *4 (D. Conn. Apr. 6, 2016) ("The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." (quoting *Scott*, 171 Conn. at 137)). Mr. Jacobson has "worked in medical communications [his] entire career," 2d Tr. at 335:10-15. As in *Tyco*, "the balance of hardships tips in favor" of Mr. Jacobson because "were a preliminary injunction to be granted, [Mr. Jacobson] would lose his job," *see Tyco*, 2011 WL 1790186, at *5, and Mr. Jacobson's employment by Helios will not pose an equivalent hardship for Ashfield, *see e.g. Wiederlight*, 546 A.2d at 221 ("[R]estrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights.").

Indeed, when Mr. Jacobson alerted Ashfield's Global President, Mr. Urhekar, of his plan to resign and begin employment with Helios, Mr. Urhekar did not admonish the decision. *See* Joint Ex. D. Instead, Mr. Urhekar "ha[d] nothing but sincere wishes and success in mind for [Mr. Jacobson's] future endeavor." *Id.* Mr. Urhekar testified that he and Mr. Jacobson "had a long conversation about . . . why [Mr. Jacobson] felt [setting up Helios's North America operations] was the right thing for him to do at this stage of his career," 1st Tr. at 175: 8-13, and Mr. Urhekar stated that "from a financial perspective it was an irresistible offer, which [he] could totally understand why that would be the case" *id.* at 175:24-176:1.

Thus, the salient issue is not whether Mr. Jacobson works for a competitor, but rather whether he intended to use information acquired while employed by Ashfield to compete against it, and cause irreparable harm to its business. Mr. Jacobson claims that he will not "not solicit any Ashfield business, accounts, or employees for a reasonable period of time, and does not retain a single Ashfield file." Def.'s Closing at 15. If these statements are true, Ashfield's

business will not be affected by Mr. Jacobson's employment with Helios, making any alleged irreparable harm by his mere employment with Helios speculative, rather than likely by a "clear showing." *Pryor*, 481 F.3d at 66 (providing for interim injunctive relief where "the movant, by a clear showing, carries the burden of persuasion.").

Accordingly, the motion for temporary restraining order and preliminary injunction to prevent Mr. Jacobson from working for Helios will be denied.

### B. Trade Secrets

The Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35–50 et. seq. ("CUTSA"), defines actionable "misappropriation" of a trade secret as:

> 1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Conn. Gen. Stat. § 35–51(b).

After the acquisition of InforMed in August 2010, Mr. Jacobson signed the Agreement, which detailed how the company's information and confidential files should be handled following his termination from employment. The relevant clause states:

> 8. <u>Return of Records</u>. On terminations of employment, Jacobson will deliver to Employer all records, reports, data, memoranda, notes, models, and equipment of any nature and in whatever format or media that are in his possession or under his control, prepared or acquired in the course of his employment relationship with Employer. Further, Jacobson agrees not to take with him any such

> information or data, or reproduction of any such information, that relate to the Employer Business or to parties in a contract relationship with Employer.

Agreement at 6.

Ashfield argues that "[t]he files [Mr.] Jacobson downloaded contain some of Ashfield's most sensitive information including its confidential pricing, proprietary Allegro curriculum, and strategy for its customers." Pl.'s Closing at 6. More specifically, Ashfield argues that "[Mr.] Jacobson took client lists, documents from the Global Leadership Team's file, Ashfield's competitive pricing information, Customer X's file, entire folders of information related to at least three of Ashfield's highly confidential acquisitions, the Allegro program's curricula and related Allegro files, and hundreds of documents in subfolders entitled 'Pitch and Capabilities Decks.'" *Id.* at 12.

Ashfield argues that "the evidence [has] confirmed that [Mr. Jacobson] disseminated some of Ashfield's [t]rade [s]ecrets in his possession." *Id.* at 7. Ashfield argues that "[Mr.] Jacobson disclosed revenue of one of Ashfield's customers to Andrew Minnock by text message" and "disclosed Ashfield's customers that [Mr.] Jacobson considered Apollo 'targets' to NorthEdge," thereby "using Ashfield's [t]rade [s]ecrets for his improper purposes." *Id.*

Ashfield argues that "[t]he irreparable harm in this case is real, not hypothetical, and has already been inflicted." *Id.* at 8. In Ashfield's view, "[Mr.] Jacobson admits he intends to compete and has already taken affirmative steps to compete, and forensic evidence confirmed that [Mr.] Jacobson downloaded thousands of Ashfield's documents, including Ashfield's [t]rade [s]ecrets." *Id.* According to Ashfield, Mr. Jacobson "must be enjoined to protect Ashfield from erosion of its goodwill." *Id.* (citing *Entegee*, 2015 WL 5202902, at *18-*19).

Mr. Jacobson argues that his actions should not be characterized as an improper use of Ashfield's trade secrets. *See* Def.'s Closing at 8 ("At no point did Mr. Jacobson provide Helios, Apollo, or anyone else with Ashfield's confidential, proprietary, or trade secret files."); *id.* at 9 ("He did not intend to use any of the Ashfield files to unfairly compete or hurt Ashfield, and he has not done so."). At the two-day hearing, Mr. Jacobson also emphasized another clause in the Agreement, which provides him the liberty to use his own, personal knowledge when working for a new employer. *See* 2d Tr. at 432:8-15. This clause states that:

> 7. <u>Confidential Information</u>. For purposes of this Agreement, proprietary or business-sensitive information is information not generally known to the public that, if released to unauthorized persons, would be detrimental to the reputation or business interests of Employer, its affiliates, or parties· with which it does business, or would permit such unauthorized persons to benefit improperly ("Confidential Information"). Jacobson acknowledges that such Confidential Information is the property of Employer. Jacobson agrees that he will not, either during his employment with Employer or thereafter, (a) disclose any Confidential Information to others (except as required in the performance of his duties to Employer) or (b) use any such Confidential Information for his own or another's benefit, provided that Jacobson shall not be restricted from using his general knowledge or his unaided memory as a result of viewing Confidential Information.

Agreement at 5.

Mr. Jacobson argues that he "has over twenty years' experience in medical communications, covering most every facet of the business, and does not need Ashfield's information to succeed." Def.'s Closing at 8. He alleges that he "plans to use only his general knowledge and unaided memory, which the Confidential Information section of his Employment Agreement expressly permits." *Id.*

Mr. Jacobson also argues that "much of Ashfield's medical communications work itself is not particularly sensitive." *Id.* at 10. He alleges that "Ashfield regularly publicizes client

company names and accounts during capabilities presentations and pitches, as well as in industry magazines and other forums." *Id.*

Mr. Jacobson contends that "Ashfield has the opportunity to pursue its claims against [him] in the pending litigation and recover its losses, if any, if it can prove liability and establish damages. However, it has failed to show that the Court should . . . preemptively bar [him] from working because of what it claims he might do." *Id.* at 1 (emphasis omitted). Mr. Jacobson also argues that "Ashfield has no evidence that new competition will ruin its business or that Mr. Jacobson has solicited, or even intends to solicit, business away from it. Nor has Ashfield presented evidence that Mr. Jacobson has misappropriated information that he will use to damage its business." *Id.* at 3.

According to Mr. Jacobson, "there is no irreparable harm, and no need for an injunction." *Id.* Mr. Jacobson also argues that "[e]ven if the Court determines [that there has been irreparable harm], Ashfield has made no showing that monetary damages would not suffice and, therefore, an injunction still would not be warranted because it has an adequate remedy at law." *Id.* (citing *New England Eyecare of Waterbury, P.C. v. New England Eyecare, P.C.*, No. 099465, 1991 WL 27919, at *6 (Conn. Super. Ct. Jan. 18, 1991)).

The Court agrees, in part.

Irreparable harm is an "injury for which a monetary award cannot be adequate compensation." *Minnesota Mining*, 191 F. Supp. 2d at 277 (quoting *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995). Courts in this Circuit have found that the "[t]he mere possibility of harm is not sufficient; the harm must be imminent and the movant must show it is likely to suffer the irreparable harm if the equitable relief is denied." *Hirschfeld v. Stone*, 193 F.R.D. 175, 185 (S.D.N.Y. 2000); *Jayaraj*, 66 F.3d at 38-39 ("Because we hold that [the plaintiff] failed to

establish that he would suffer irreparable harm in the absence of an injunction, there is no need to reach the second portion of the preliminary injunction analysis.").

In *Minnesota Mining,* the defendant was "extremely familiar with the strengths and limitations of [the plaintiff]'s proprietary methods," and "became familiar with [the company's] . . . equipment, [product] recipes[,] and [] procedures." 191 F. Supp. 2d at 276. In that case, the defendant planned to work for a company "in the process of redefining itself as a major producer of specialty. . . products," by "developing [products that] [we]re the same or similar to the products that [the plaintiff] design[ed] and manufacture[d]." *Id.*

The court in *Minnesota Mining* found that

> when a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secrets and other confidential and proprietary information will be used and disclosed by the employee in the course of his new work, enforcement of covenants not to compete and other similar agreements are necessary to protect against such use and disclosure.

*Id.* at 277 (emphasis omitted) (citing *Branson Ultrasonics Corp. v. Stratman*, 921 F. Supp. 909, 913 (D. Conn. 1996); *Continental Group, Inc. v. Kinsley*, 422 F. Supp. 838, 844-45 (D. Conn. 1976)). "An employee . . . working in the same field on the same product, even with the utmost good faith, cannot be expected to compartmentalize his knowledge so his decisions and disclosures are not tainted by information he is prohibited from using." *Id.* at 278.

Here, Mr. Jacobson plans to work within the same market as Ashfield, Compl. ¶ 44 ("Ashfield offers the same services in overlapping markets, and Helios competes against Ashfield for the same customers."), and will hold a similar role, *id.* ¶ 38 (Mr. Jacobson was "the highest-ranked Ashfield employee in the United States and oversaw all of Ashfield's United States operations and employees."); Def.'s Mem at 16 (Mr. Jacobson would be "serving as the head of Helios's operations in the United States"). But Section Seven of the Agreement

expressly permits Mr. Jacobson's use of "personal knowledge," at any point following his termination of employment with Ashfield. *See* Agreement at 5. Mr. Jacobson has gained knowledge "over twenty years" of experience in the medical communications industry, Def.'s Closing at 8, which may lead him to be successful in his new role without the use of information gained from Ashfield.

As a result, without more, it is speculative that anything Mr. Jacobson will do for Helios would be based on Ashfield's trade secrets. *See Jayaraj*, 66 F.3d at 39 ("[W]here monetary damages may provide adequate compensation, a preliminary injunction should not [be] issue[d]. Furthermore, the harm must be imminent or certain, not merely speculative." (internal citation omitted)). Of course, if at some point in the future, Mr. Jacobson's use of Ashfield's trade secrets is proven and found to have harmed Ashfield economically – and the copious materials downloaded by Mr. Jacobson in connection with his departure from Ashfield played a role in it – Ashfield could be entitled to monetary relief for proven economic injuries. *See Wiederlight*, 208 Conn. at 542-43 ("The proper measure of damages for breach of a covenant not to compete is the nonbreaching party's losses rather than the breaching party's gains."); *see also id.* ("To permit the plaintiff to recover damages merely by proving that the defendant breached the [restrictive] covenant . . . would ignore the well established rule that damages are essential to the plaintiff's proof and must be shown with reasonable clarity.").

But no such use can be reasonably proven at this time on this limited record. *See Pryo*, 481 F.3d at 66 (providing for interim injunctive relief where "the movant, by a clear showing, carries the burden of persuasion."); *see also Jayaraj*, 66 F.3d at 40 (vacating preliminary injunction based on "evidence of speculative and attenuated injuries" which "shifted the burden of proof to the non-moving party to show that under no circumstances would a later fact-finder

award inadequate monetary damages."). Nevertheless, Mr. Jacobson can and should be required to return any and all remaining documents or relevant technology containing information belonging to Ashfield.[1] *See e.g.*, *Tymetrix, Inc.*, 2006 WL 3908558 at *6 (ordering that the defendant return to his former employer all "documents, in whatever form or media maintained or stored, without retaining any copies of such materials").

Accordingly, the motion for temporary restraining order and preliminary injunction against Mr. Jacobson's use of Ashfield's trade secrets will be denied, but he will be ordered to return immediately any and all remaining documents or relevant technology containing information belonging to Ashfield.

## IV.    CONCLUSION

For the reasons stated above, Ashfield's motion for temporary restraining order and preliminary injunction is **DENIED in part** and **GRANTED in part**. Mr. Jacobson shall be permitted to work for Ashfield's competitor, but must return to Ashfield all information, if any, still in his possession and belonging to Ashfield.

**SO ORDERED** at Bridgeport, Connecticut, this 1st day of July, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[1] There still appears to be a disagreement between the parties as to whether Mr. Jacobson has provided Ashfield with all of the information belonging to Ashfield in his possession. *See* Pl.'s Closing at 15 ("Ashfield respectfully requests that the Court . . . order[] [Mr.] Jacobson to produce all of the electronic devices in his home for forensic imaging and scrubbing, as necessary, of Ashfield's [t]rade[s]ecrets."); Def.'s Closing at 7 ("Ashfield has no evidence showing that Mr. Jacobson still possesses any of its materials . . . . [and] relies entirely on speculation and conjecture . . . to show that Mr. Jacobson could have retained or shared Ashfield files, because there is zero evidence that he did so." (emphasis omitted)).